# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

Nicholas Franze & George Schrufer, Jr.,
Individually and On Behalf of All Others
Similarly Situated,

              Plaintiffs,

      v.

BIMBO FOODS BAKERIES
DISTRIBUTION, LLC et al.,

          Defendants.

Civil Action No.: 7:17-cv-03556-NSR-JCM

*Electronically Filed*

---

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

MORGAN, LEWIS & BOCKIUS LLP
Melissa C. Rodriguez
101 Park Avenue
New York, NY 10178-0060
(212) 309-6394

Michael J. Puma
1701 Market Street
Philadelphia, PA 19103
(215) 963-5305

*Attorneys for Defendants*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...............................................................................................1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ................................2

III.  ARGUMENT ....................................................................................................2

    A.   Contractor Status Can Be Determined Through Summary Judgment..................2

    B.   Plaintiffs Are Independent Contractors Under The FLSA And NYLL.................3

        1.   Plaintiffs Are Independent Contractors Under The FLSA ........................3

            a.   Plaintiffs Controlled Their Distributorships .................................4

                (i)   Plaintiffs Chose The Form And Scope Of Their Distributorships ................................................................4

                (ii)   Plaintiffs Controlled Their Vehicles And The Clothes Wore And Selected Their Own Insurance.............5

                (iii)   Plaintiffs Were Free To And Did Retain Workers ............6

                (iv)   Plaintiffs Controlled When And How Much To Work ........................................................................................6

                (v)   Plaintiffs Received No Mandatory Training Or Policies On How To Meet Their Contractual Obligations ........................................................................7

                (vi)   Plaintiffs Operated Without Supervision............................8

                (vii)   Additional Evidence Reflects Plaintiffs', Not Defendants', Control Of Their Businesses ........................9

             b.   Plaintiffs Made Significant Investments In Their Businesses and Faced Opportunities For Profit And Risks of Loss ........................................................................................11

             c.   Plaintiffs' Success Depended On Their Skill And Initiative........13

             d.   Plaintiffs' Undisputed Control Over The Duration And Permanence Of Their Relationship With BFBD Favors Independent Contractor Status ....................................................14

             e.   Whether Or Not Plaintiffs' Work Is Integral To Defendants' Businesses, That Plaintiffs' Work Could Be Performed By Others Favors Independent Contractor Status ......16

             f.   Additional Undisputed Facts Favor Plaintiffs' Status As Independent Contractors............................................................16

        2.   Plaintiffs Are Independent Contractors Under The NYLL And Thus All Of Their NYLL Claims Fail .......................................................17

-i-

## TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|

a.    Plaintiffs Controlled The Means To Achieve Their Results ........19

b.    Plaintiffs Understood They Were Independent Contractors And ████████████████████████████ ........20

c.    Plaintiffs Worked At Their Own Convenience Because They Could Choose How Much They Worked And Their Schedules ..................................................................20

d.    Plaintiffs Were Free To Engage In Other Work/Businesses ........22

e.    Plaintiffs Did Not Receive Any Employee Benefits ...................22

f.    Plaintiffs Were Not On Defendants' Payrolls .............................22

C.    Schrufer's NYLL Claims Fail Because He Released Them................................23

D.    Plaintiffs' NYLL Deductions Claims Also Fail Because (1) They Were Not Paid Wages, And (2) Adjustments To Revenue Were Not Wage Deductions ........................................................................23

1.    Plaintiffs Were Not Paid "Wages" Within The Meaning Of The NYLL ..................................................................23

2.    There Were No Deductions From Earned Wages ...................24

IV.    CONCLUSION ........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Browning v. Ceva Freight, LLC,*
    885 F. Supp. 2d 590 (E.D.N.Y. 2012) ............................................................................ passim

*Bynog v. Cipriani Grp., Inc.,*
    1 N.Y.3d 193 (2003) ..................................................................................................... 18

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................................................... 2

*Chao v. Mid-Atlantic Installation Servs., Inc.,*
    16 F. App'x 104 (4th Cir. 2001) ................................................................................ 4, 13

*Deboissiere v. Am. Modification Agency,*
    No. 09 Civ. 2316, 2010 WL 4340642 (E.D.N.Y. Oct. 22, 2010) ..................................... 18, 20

*Difilippo v. Barclays Capital, Inc.,*
    552 F. Supp. 2d 417 (S.D.N.Y. 2008) ........................................................................... 23

*Herman v. Express Sixty-Minutes Delivery Serv., Inc.,*
    161 F.3d 299 (5th Cir. 1998) ...................................................................................... 17

*Levy v. Verizon Info. Servs., Inc.,*
    498 F. Supp. 2d 586 (E.D.N.Y. 2007) .......................................................................... 24

*Meyer v. U.S. Tennis Ass'n,*
    607 F. App'x 121 (2d Cir. 2015) ................................................................................... 3

*Pachter v. Bernard Hodes Group, Inc.,*
    10 N.Y.3d 609 (2008) .......................................................................................... 2, 24, 25

*Preacely v. AAA Typing & Resume, Inc.,*
    No. 12 CIV. 1361 AT RLE, 2015 WL 1266852 (S.D.N.Y. Mar. 18, 2015) ......................... 3, 4

*Razak v. Uber Techs., Inc.,*
    No. CV 16-573, 2018 WL 1744467 (E.D. Pa. Apr. 11, 2018) ...................................... 4, 8, 11

*Rose v. Northwestern Mutual Life Ins. Co.,*
    220 F. Supp. 3d 363, 375 (E.D.N.Y. 2016) .................................................................... 8

*Saleem v. Corp. Transp. Grp., Ltd.,*
    52 F. Supp. 3d 526, 540 (S.D.N.Y. 2014), *aff'd*, 854 F.3d 131 (2d Cir. 2017) ..................... 18

i

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Saleem v. Corporate Transportation Group, Ltd.*,
   854 F.3d 131 (2d Cir. 2017) .............................................................................passim

*Sellers v. Royal Bank of Canada*,
   No. 12 CIV. 1577 KBF, 2014 WL 104682 (S.D.N.Y. Jan. 8, 2014), *aff'd*, 592
   F. App'x 45 (2d Cir. 2015) ...............................................................................passim

*United States v. Silk*,
   331 U.S. 704 (1947) ..................................................................................................6

*Vega v. Postmates Inc.*,
   162 A.D.3d 1337, 78 N.Y.S.3d 810 (N.Y. App. Div. 2018) ............................11, 19

*Velu v. Velocity Exp., Inc.*,
   666 F. Supp. 2d 300 (E.D.N.Y. 2009) ...............................................................passim

## STATUTES

Fair Labor Standards Act...................................................................................................1

FLSA ..........................................................................................................................passim

N.Y. Lab. Law § 193 .........................................................................................18, 23, 24

N.Y. Lab. Law § 195 ....................................................................................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(e) .......................................................................................................2

Local Rule 56.1 ..............................................................................................................2

## I.       INTRODUCTION

Nicholas Franze ("Franze") and George Schrufer, Jr. ("Schrufer") ("Plaintiffs")
purchased distribution rights and contracted with Bimbo Foods Bakeries Distribution, LLC
("BFBD")[1] to sell baked goods manufactured by Defendants or their affiliates.[2]  After years of
operating their distributorship businesses as independent contractors,[3] enjoying the benefits of
that status ███████████████████████████, Plaintiffs now claim they are
employees.  They assert that they are owed overtime under the Fair Labor Standards Act
("FLSA") and New York Labor Law ("NYLL") and that Defendants made illegal "deductions"
from their "wages" and failed to maintain records required by the NYLL.

Plaintiffs make these claims despite the undisputed evidence that Plaintiffs (1) voluntarily
purchased distribution rights and could (and did) buy and sell pieces of their territories; (2) were
not required to personally operate their businesses, but were free to and did hire their own
workers; (3) selected/supplied their own vehicles, "tools of their trade," and paid all their
expenses; (4) claimed ████████████████████████████
███████; and (5) freely operated their businesses subject only to the demands of their customers,
unfettered by any supervision or training by Defendants.  The undisputed evidence further
reflects that the freedom afforded Plaintiffs to run their businesses came with significant
opportunities for profit and risks of loss as their success or failure depended on their ability to
drive sales and manage their customers, inventory, and expenses.  Plaintiffs cannot create a

---

[1] Schrufer contracted with the Charles Freihofer Baking Company, Inc., which contract was later assigned to BFBD.

[2] This Motion is filed on behalf of Defendant Bimbo Bakeries USA, Inc. ("BBUSA") as well, but Plaintiffs have
adduced no evidence that BBUSA was a joint employer of Plaintiffs with BFBD, as Plaintiffs allege in their Third
Amended Complaint (Dkt. 46) (the "Complaint").  Plaintiffs' contracts are only with BFBD, which is not their
"employer."  For the convenience of the Court and ease of reference in this Motion and related submissions,
however, BFBD and BBUSA generally are collectively referred to as "Defendants."

[3] Independent contractors are known in the industry and referred to herein as "Independent Operators" or "IOs."

genuine dispute of material fact as to their classification as independent contractors and, therefore, they cannot recover on any of their claims, all of which turn on alleged misclassification.  Accordingly, summary judgment should be granted.[4]

Moreover, summary judgment is appropriate at least in part regardless of employee/contractor status.  First, Schrufer's NYLL claims should be dismissed because he released them.  Second, the unlawful deductions claims are barred because (1) Plaintiffs did not earn "wages" as defined by the NYLL; and (2) the "deductions" Plaintiffs challenge were permissible adjustments to the calculation of their revenues authorized by the New York Court of Appeals' decision in *Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y.3d 609, 617-18 (2008).

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants incorporate by reference their Local Rule 56.1 Statement of Undisputed Material Facts and cite thereto as ("UF ¶ _").

## III.   ARGUMENT

### A.    Contractor Status Can Be Determined Through Summary Judgment.

Summary judgment "shall be rendered" if "there is no genuine issue as to any material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.3 (1986).  To prove a genuine issue of material fact exists, Plaintiffs must, by admissible evidence, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Chapotkat v. Cty. of Rockland*, No. 11-CV-06209 NSR, 2014 WL 1373531, at *4 (S.D.N.Y. Apr. 4, 2014) (Roman, D.J.), *aff'd*, 605 F. App'x 24 (2d Cir. 2015).

---

[4] Although this Motion addresses only Plaintiffs' proper classification as independent contractors because that narrow defense is dispositive of the case, many other defenses remain that would be addressed at or prior to trial if the Motion is denied.  For instance, given their admitted operation of commercial motor vehicles and admitted daily focus on sales, Plaintiffs both qualify for the motor carrier and outside sales exemptions to the FLSA and NYLL.

The Second Circuit recently made clear that contractor status can be resolved as a matter of law. *Saleem v. Corporate Transportation Group, Ltd.*, 854 F.3d 131, 148 (2d Cir. 2017) (affirming summary judgment on FLSA claims where plaintiffs were determined to be independent contractors). Absent material fact disputes, "whether workers are employees or independent contractors—is a question of law" that can be resolved on summary judgment. *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 598 (E.D.N.Y. 2012) (granting summary judgment and concluding that delivery drivers were independent contractors under the FLSA and NYLL); *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 305 (E.D.N.Y. 2009) (same).

**B.     Plaintiffs Are Independent Contractors Under The FLSA And NYLL.**

Plaintiffs' claims fail as a matter of law because there is no genuine dispute that they were[5] independent contractors under both the FLSA and NYLL.

*1.     Plaintiffs Are Independent Contractors Under The FLSA.*

The FLSA test for contractor status is one of "economic reality." *Saleem*, 854 F.3d at 139. Courts generally assess the following factors: (1) the degree of control exercised by the alleged employer over the worker, (2) the worker's opportunity for profit or loss and his or her investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the alleged employer's business. *Meyer v. U.S. Tennis Ass'n*, 607 F. App'x 121 (2d Cir. 2015) (affirming summary judgment against independent contractors). However, these factors are not an exhaustive list, and no single factor is dispositive. *Id.* at 121; *Preacely v. AAA Typing & Resume, Inc.*, No. 12 CIV. 1361 AT RLE, 2015 WL 1266852, at *7

---

[5] For the convenience of the Court, Defendants employ the past tense in analyzing Plaintiffs' claims. Schrufer sold his distribution rights in July 2017 and, while Franze continues to operate under his Distribution Agreement, the analysis herein is based on evidence up until the close of stage one discovery in this case.

(S.D.N.Y. Mar. 18, 2015).  Rather, courts assess the "totality of the circumstances" before

rendering a decision.  *Preacely*, 2015 WL 1266852, at *7.  Significantly, not every factor must

favor independent contractor status in order for a court to conclude as a matter of law that no

employee-employer relationship exists.  *See Saleem*, 854 F.3d at 138 (affirming that drivers were

independent contractors as a matter of law, despite fifth factor weighing in favor of employee

status); *Chao v. Mid-Atlantic Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001) (same,

although two factors were neutral or favored employee status); *Razak v. Uber Techs., Inc.*, No.

CV 16-573, 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018) (granting summary judgment

although two factors supported employee status).

### a. *Plaintiffs Controlled Their Distributorships.*

The undisputed facts establish that Defendants did not exercise control necessary for

Plaintiffs to be employees.  Plaintiffs' Agreements provide that "[a]s an independent contractor,

Distributor has the right to operate his business as [he] chooses, and shall bear all [risks and/or

costs] of operating such business . . ."  UF ¶¶ 19, 50, 51.  Thus, they require only specific results

without controlling the manner or means to accomplish them.  UF ¶¶ 49-51.

### (i) Plaintiffs Chose The Form And Scope Of Their Distributorships.

That Plaintiffs chose to purchase their businesses and controlled their form, size, and

scope favors contractor status under the FLSA.  The Second Circuit held:

> From the start, Plaintiffs were "driver-owners" who made significant decisions
> regarding the operation of their small businesses.  ***Plaintiffs chose not only to
> enter into a franchise agreement [with defendant] instead of seeking more
> conventional employment, but also exercised considerable discretion in
> choosing the nature and parameters of that affiliation***.

*Saleem*, 854 F.3d at 140-41 (emphasis added).  Similarly, Plaintiffs chose to purchase their

distribution rights voluntarily, selected which territories were of interest to them, and whether to

incorporate, or create LLCs or other company structures, to operate their distributorships.  UF ¶¶ 1, 10, 11, 14, 16-18.  Plaintiffs controlled the size and scope of their territories, as they could buy or sell portions of distribution rights to/from other IOs.  UF ¶ 52.  Schrufer did so multiple times, negotiating the deals himself.  UF ¶¶ 53-58.  Plaintiffs were free to stop serving unprofitable accounts or to contract with other IOs to sell to one or more of their customers.  UF ¶¶ 59, 60.  As in *Saleem*, Plaintiffs' freedom to make these choices favors contractor status.

**(ii)      Plaintiffs Controlled Their Vehicles And The Clothes Wore And Selected Their Own Insurance.**

Plaintiffs determined the vehicles they used (and whether to buy or lease and how to finance them) and the clothes they wore to conduct their business.  UF ¶¶ 20, 22-27, 136-40.  They also chose insurance for their businesses, subject only to coverage requirements. UF ¶ 21.  Nearly identical facts favored independent contractor status in *Velu*, where the court concluded that plaintiff was an independent contractor, highlighting that he "owns, insures, maintains, and services his delivery van without [defendant's] reimbursement or contribution."  666 F. Supp. 2d at 303  It did not matter that the defendant require plaintiff to "provide proof of commercial insurance and occupational accident insurance coverage."  *Id.*  The same conclusion applies here.

The *Velu* court also emphasized that defendant did not require uniforms or "clothing of any kind," and that plaintiff's van was not required to bear defendant's signage.  666 F. Supp. 2d at 303; *Browning*, 885 F. Supp. 2d at 608 (alleged control over "car decals and uniforms" not "so great as to weigh in favor of finding the Plaintiffs to be employees").  The same is true here: (1) Plaintiffs chose to enter into advertising agreements whereby they were paid for wearing brand logos on their clothing and their trucks; (2) Plaintiffs could terminate such agreements on 30 days' notice; and (3) Defendants did not control their clothing selections.  UF ¶¶ 136-40.

5

### (iii)     Plaintiffs Were Free To And Did Retain Workers.

That Plaintiffs could and did hire workers to assist them also favors contractor status. *Saleem*, 854 F.3d at 143 (that "some Plaintiffs . . . permitted other individuals to drive for them" favored independent contractor status); *United States v. Silk*, 331 U.S. 704, 719 (1947) (that "driver-owners . . . hire their own helpers" favored independent contractor status).  Unlike employees, who cannot hire others to do their jobs, Plaintiffs were not even required to work; they could hire workers to carry out  their contractual responsibilities without any permission from Defendants.  UF ¶¶ 61-71.  *Saleem*, 854 F.3d at 143, 146.  Indeed, one IO who owned 4-5 routes and hired workers to operate them. UF ¶ 63.

Plaintiffs were responsible for interviewing, selecting, hiring, compensating, directing, supervising, disciplining, evaluating, and discharging any such workers.  UF ¶¶ 61-71.  Both Franze and Schrufer used workers at various points in the operation of their businesses, including relying on a worker for at least two years to perform merchandising and other activities.  UF ¶¶ 65, 69, 70.  These facts favor Plaintiffs' status as independent contractors as a matter of law.

### (iv)     Plaintiffs Controlled When And How Much To Work.

"The ability to choose how much to work also weighs in favor of independent contractor status."  *Saleem*, 854 F.3d at 146.  In *Velu*, the court concluded that a delivery driver responsible for picking up packages from his alleged employer and delivering them was an independent contractor where, "each day, [Plaintiff] sets his own schedule and decides which routes he will take to fulfill his deliveries."  666 F. Supp. 2d at 303.  This was true despite the fact that "[defendant] has communicated to him that certain clients have time requirements for their deliveries, and thus, [plaintiff] route[d] his deliveries according to those schedules."  *Id.*

*Velu* compels the same conclusion here.  While some of Plaintiffs' customers imposed requirements such as the days and times to sell/deliver products or perform merchandising (*i.e.*,

rotating products, setting up displays, etc. (UF ¶ 72-74, 77, 81), Defendants did not impose any

schedule except as to the hours when IOs could purchase products at the depots.  UF ¶¶ 78-83.

*See Saleem*, 854 F.3d at 146 ("Defendants required no notice on the part of drivers as to when

they intended to work, nor did they make any effort to coordinate drivers' schedules" or to "set

lower or upper limits on working hours").  Similarly, Plaintiffs selected their own delivery times

and routes subject only to their customers' requirements.  UF ¶¶ 72-83, 124.  *Velu*, 666 F. Supp.

2d at 303 ("[S]ubject to the demands of the clients, [plaintiff] is free to make his own schedule . .

.").  These facts favor contractor status.

Plaintiffs' freedom to take breaks and make stops for personal reasons (UF ¶¶ 82, 83)

also shows contractor status.  *See Velu*, 666 F. Supp. 2d at 303 ("[Plaintiff] decides when, where,

and how long to break for lunch, and he also decides the duration of his lunch break each day"

and "may make stops for personal reasons").  Plaintiffs could also take time off at their

discretion.  UF ¶¶ 65, 69, 82, 83.  This all favors contractor status.  *Saleem*, 854 F.3d at 146

("Some Plaintiffs took vacations for weeks at a time without ever notifying Defendants.");

*Sellers v. Royal Bank of Canada*, No. 12 CIV. 1577 KBF, 2014 WL 104682, at *6 (S.D.N.Y.

Jan. 8, 2014), *aff'd*, 592 F. App'x 45 (2d Cir. 2015) (granting summary judgment for defendant

when plaintiff decided when to arrive at and depart from work office and when to take breaks).

### (v)    Plaintiffs Received No Mandatory Training Or Policies On How To Meet Their Contractual Obligations.

Plaintiffs were not subject to any mandatory training, as no such training exists.  UF ¶¶

117-119.  Plaintiffs are unaware of any policies, and presented no evidence of such policies,

governing the manner or means to carry out obligations under the Distribution Agreements (to

develop and maximize sales, rotate or remove products, cooperate in marketing programs, or

otherwise provide service consistent with good industry practice).  UF ¶¶ 93, 101, 102, 121-123.

7

Defendants anticipate that Plaintiffs will point to limited "rules" Defendants articulated with respect to Plaintiffs' use of Defendants' facilities (*e.g.*, parking their trucks overnight, bringing minors onto the premises, use of electrical outlets).  These "rules"—like those imposed by any premises owner—are immaterial to the results Plaintiffs contracted to achieve under their Agreements and the means by which they did so.  Such policies do not show that Defendants exercised employer-like control where they "wielded virtually no influence over other essential components of the business, including when, where, in what capacity, and with what frequency" Plaintiffs worked.  *Saleem*, 854 F.3d at 148-49; s*ee also Razak*, 2018 WL 1744467, at *16 (limitations for "safety and quality control" do not undermine independent contractor status).

### (vi)     Plaintiffs Operated Without Supervision.

Lack of supervision over the performance of a worker's duties supports an independent contractor finding.  *See Velu*, 666 F. Supp. 2d at 303 (that delivery driver "makes his deliveries without being required to report to [defendant]" supports independent contractor status).  Here, Plaintiffs are unaware of any policy or anything in their Distribution Agreements articulating "performance standards" or otherwise authorizing Defendants to supervise or monitor them.  UF ¶¶ 127-31.  *Velu*, 666 F. Supp. 2d at 307 (that defendant did not "supervise plaintiff's work, except to account for payments it owed to plaintiff" favored contractor status).  Nor were they subject to performance reviews, as employees would be.  UF ¶ 120.  *See Sellers*, 2014 WL 104682, at *3 ("no formal performance reviews" favors contractor status).  Plaintiffs also were not required to attend any meetings.  UF ¶ 117.  *See Rose v. Northwestern Mutual Life Ins. Co.*, 220 F. Supp. 3d 363, 375 (E.D.N.Y. 2016) (even "regular company meetings" are insufficient to establish employee status); *Browning*, 885 F. Supp. 2d at 607 (requirement to "attend monthly meeting" did "not weigh against a finding of independent contractor status").  Plaintiffs acknowledged the limited communications with Defendants' representatives concerning sales,

promotions, product availability, customer requirements, and issues related to their Agreements. UF ¶¶ 132-35.  Plaintiffs adduced no evidence reflecting that Defendants communicated with them regularly about the manner or means by which they ran their businesses.

Given this, it is fair to ask what control actually existed.  Franze reported that "control" over him was that which was expressly spelled out in his contract, *i.e.*, that he would receive a "breach letter" giving him three days to do something required by the contract that he had failed to do, which breach letters BFBD was contractually obligated to provide.  UF ¶ 125.  In fact, the only documents Franze identified as reflecting Defendants' alleged control were his Distribution Agreement, a voluntary advertising agreement, and other documents that do not reflect Defendants' control over the means by which he operated his business and carried out his daily work.  UF ¶¶ 130-31.  The absence of a genuine dispute as to supervision by Defendants again favors contractor status.

### (vii)   Additional Evidence Reflects Plaintiffs', Not Defendants', Control Of Their Businesses.

Other undisputed evidence reflects the great degree to which Plaintiffs, not Defendants, controlled their businesses.  Plaintiffs controlled how they sold products to their customers and could increase sales and profits in a number of ways.  UF ¶¶ 94-100.  Plaintiffs were not required to solicit new customers and made varying decisions whether to do so.  UF ¶¶ 35, 41, 127. Plaintiffs made varying efforts to independently develop and maintain good relationships with customers, communicate with their customers about displays and promotions, obtain additional shelf space from customers, rotate products and ensure an adequate supply of fresh products, remove less fresh product, minimize the need for returned products, offer new products, and communicate with consumers.  UF ¶¶ 94-100, 104.  Again, Plaintiffs did these things without any policies or meaningful supervision from Defendants.  *See supra* at 8-9.

Plaintiffs were responsible for managing their inventory and determining what to order based on their customers' needs and their own experience.  UF ¶¶ 84-92.  Plaintiffs freely and regularly made adjustments to order amounts suggested by the ordering system or ignored the recommendations completely.  UF ¶¶ 86-92.  Plaintiffs claimed only a few instances over the course of years in which Defendants' representatives allegedly adjusted orders such that they received more/less product than desired.  UF ¶¶ 91-92.  Of course, Plaintiffs had no specific recall of any such instance, but even if true, Plaintiffs acknowledged they could refuse to accept extra product or return it for credit, such that it did not affect their profit or loss.  UF ¶¶ 89-92.

Defendants anticipate that Plaintiffs will argue that they did not control their relationships with chain customers in their territories because Defendants negotiated pricing and other terms with those customers.  It is true that because many chain stores establish uniform standards across all of their stores on a regional or national basis, Plaintiffs agreed in their Distribution Agreements to designate BFBD as Plaintiffs' nonexclusive agent to negotiate for them about pricing and other terms.  UF ¶ 105.  However, Plaintiffs retained the right to revoke Defendants' agency.  UF ¶ 107.  Whether they did so or not, Plaintiffs had authority to negotiate pricing and other terms with the stores.  UF ¶ 106, 111.  Indeed, Plaintiffs communicated directly with chain stores about expectations and/or displays.  UF ¶¶ 77, 112-13.  Schrufer even ignored chain store requirements for product displays that he believed were negotiated by Defendants.  UF ¶ 110.

Thus, to the extent Defendants dealt with these customers for Plaintiffs, they were contractually obligated to do so by the contracts that Plaintiffs voluntarily signed.  UF ¶ 105. And Plaintiffs were free but elected not to revoke Defendants' agency or attempt negotiations themselves.  UF ¶ 108.  Regardless, the mere negotiation of some terms for some customers is nothing more than the "[m]inimal or incidental control" that courts have concluded is

"insufficient to establish a traditional employment relationship." *Browning*, 885 F. Supp. 2d at 598. *See also Saleem*, 854 F.3d at 138 (concluding that car service drivers were independent contractors despite fact that alleged employer negotiated rates with clients and supplied dispatch system through which services were ordered); *Vega v. Postmates Inc.*, 162 A.D.3d 1337, 78 N.Y.S.3d 810, 812 (N.Y. App. Div. 2018) (defendant's control over fees charged and rates paid did not support employee status); *Razak*, 2018 WL 1744467, at *17 (granting summary judgment on contractor status against Uber drivers; control over pricing did "not create any material dispute" of fact because "profit and loss factor does not require that Plaintiffs be solely in control of their profits or losses"). This is particularly true here, as Plaintiffs otherwise conducted business with these and other customers "without the [putative] employer's direct supervision or input over the means used to complete the work," the absence of which "is insufficient to establish a traditional employment relationship." *Browning*, 885 F. Supp. 2d at 598. For all these reasons, the control factor heavily favors the conclusion that Plaintiffs were contractors as a matter of law.

### b.   *Plaintiffs Made Significant Investments In Their Businesses and Faced Opportunities For Profit And Risks of Loss.*

That "Plaintiffs invested heavily" is "another indication that they were in business for themselves." *Saleem*, 854 F.3d at 144. The Second Circuit has held that "[i]n the economic reality test, large capital expenditures . . . are highly relevant to determining whether an individual is an employee or an independent contractor." *Id.* When the expenditures are made "in an attempt to generate a return on investment," they favor contractor status. *Id.* In *Saleem*, that car service rights were purchased for between $70,000 and $90,000 constituted "a substantial financial outlay," in addition to the contractual obligation to pay for "fuel, repair, maintenance, license, registration, and insurance fees." *Id.* at 144-45.

11

Here, Plaintiffs paid ██████ for their distribution rights while paying the same expenses for their vehicles, gas, maintenance, and repairs, as well as for their handheld computers.  UF ¶¶ 13-14, 20.  Franze purchased his route from another IO and, after analyzing the purchase, made a down payment of $████ and financed, at his discretion, the remaining $████ of the purchase price.  UF ¶¶ 10-13.  Schrufer purchased his distribution rights for a total of $██████  UF ¶ 14.  Plaintiffs each purchased their own trucks and maintained and insured those trucks at their own expense.  UF ¶¶ 20-21.  Plaintiffs also paid the other expenses associated with their distributorships.  UF ¶ 20.  When they engaged workers, Plaintiffs paid them.  UF ¶¶ 68, 71.  As admitted self-employed business owners, Plaintiffs ████████ ████████████████████████████ associated with their businesses.  UF ¶¶ 6-9.  These facts could not more clearly favor contractor status.  *See Browning*, 885 F. Supp. 2d at 608 ("Plaintiffs made substantial investments in their businesses.  They utilized their own vehicles and all of their own tools and supplies, which of course supports a finding of independent contractor status.").

Plaintiffs' opportunity for profit and loss also supports a finding of independent contractor status.  In *Browning*, delivery drivers responsible for making pick-ups and deliveries were independent contractors where they "had the opportunity for both profit and loss."  885 F. Supp. 2d at 608.  Their contracts "did not guarantee a certain amount of work" and some plaintiffs "operated at a loss during certain years."  *Id.*  "[W]hether the Plaintiffs made more money or less money depended largely on" steps they took to "increase their efficiency and capacity," which facts "weigh in favor of a finding of independent contractor status."  *Id*.

Plaintiffs bore significant responsibility for profit and loss and acknowledged the many opportunities and risks they faced.  UF ¶ 31-48.  Plaintiffs generated revenue by purchasing

products from BFBD at wholesale prices and selling them at higher prices to their customers, hoping to profit on the difference.  UF ¶ 30.  Thus, Plaintiffs' success depended on their ability to maximize sales, which was their constant focus.  UF ¶¶ 94-95.  Those sales and profits fluctuated annually and even weekly based on a variety of factors: store/customer openings and closings, promotions, increased demand, special orders, holidays, seasonal fluctuations, increased or decreased competition, and weather.  UF ¶¶ 32-48.  Because Plaintiffs owned the products they purchased from Defendants, they bore the risk of losing or damaging those products.  UF ¶ 31.  Plaintiffs could lose all of their profits if they were hurt or sick and forced to pay someone to run their businesses.  UF ¶¶ 37, 45.  Similarly, Plaintiffs could profit, or face a loss, on the sale of some or all of their distribution rights, the value of which increased or decreased with sales.  UF ¶¶ 34, 38-41, 148.  Franze testified that the value of his rights has gone down and he has taken a loss on the business to date.  UF ¶ 38.  Other IOs have enjoyed large gains.  UF ¶ 149.  In sum, this factor heavily favors contractor status as a matter of law.

                                                         *c.*      ***Plaintiffs' Success Depended On Their Skill And Initiative.***

Where success depends on workers' skill in performing their duties and their independent initiative in expanding business opportunities, this factor favors independent contractor status.  *See Chao*, 16 F. App'x at 107 (affirming independent contractor status where a worker's "net profit or loss depends on his skill in meeting [business requirements], thereby avoiding backcharges" and "on the business acumen with which the worker makes his required capital investments in tools, equipment, and a truck").  Where, as here, a worker has "significant control over essential determinants of profits in the business," this favors contractor status.  *Saleem*, 854 F.3d at 145-46.  In *Browning*, delivery drivers were found to show the type of initiative that favors contractor status because they "worked varying times, making varying amounts of money, depending largely upon how early in the day they arrived" to maximize their earnings.  885 F.

Supp. 2d at 609.  In addition, the court in *Arena v. Delux Transp. Servs., Inc.*, found that this factor favored contractor status for a driver because he "had to know how to drive," "be licensed," "navigate his routes and maintain the safety of his passengers," and "have the initiative to accept dispatched calls and transport his passengers in an efficient manner."  3 F. Supp. 3d 1, 12 (E.D.N.Y. 2014).

The undisputed evidence here shows that Plaintiffs' success depended on their skill in managing the business and initiative in selling.  For example, Schrufer drew on his experience in the grocery industry to promote his success as an IO.  UF ¶¶ 96.  These skills included learning how to increase sales and build relationships with stores and their employees, and effective ordering.  *Id*.  Franze also acknowledged the importance of developing good relationships with store managers and personnel.  UF ¶¶ 97.  Plaintiffs' ability to communicate with stores about promotions and displays, to manage and minimize product returns, to rotate and maintain fresh products, and to manage product ordering and inventory was important to their success in driving sales and profits.  UF ¶¶ 94-104.  Plaintiffs concede that managing expenses was critical to maintaining profits and that, absent sufficient sales and careful management, they could take a loss in any given year.  UF ¶¶ 95-99.  Plaintiffs necessarily had to know how to drive and safely navigate their routes, as well as take the initiative to sell products and deliver them efficiently. This factor thus again favors contractor status.

> **d.   Plaintiffs' Undisputed Control Over The Duration And Permanence Of Their Relationship With BFBD Favors Independent Contractor Status.**

Plaintiffs had the ability to sell their distribution businesses at any time and Defendants could terminate the Distribution Agreements under limited circumstances.  UF ¶¶ 144-47.  Under binding Second Circuit precedent, these facts favor contractor status:

14

> The franchise agreements' termination provisions also are indicative of Plaintiffs' independence. ***While Plaintiffs could reassess their choice to affiliate with [defendant] . . . and terminate the franchise agreements as they pleased, the terms of the agreements committed the [defendants] to maintaining them for substantial durations, or even indefinitely, absent Plaintiffs' breach of those terms.***

*Saleem*, 854 F.3d at 141 (emphasis added).  Here, the Agreements allowed Plaintiffs to sell or transfer their distribution rights at any time and take their trucks, assets, and industry knowledge to run the same or an entirely different business elsewhere.  UF ¶¶ 147, 150, 152.  *See Velu*, 666 F. Supp. 2d at 307 (fact that "if either party were to terminate the Agreement today, Plaintiff could go out the next day with the same van, clothes, equipment, computer, printer, and other supplies, and immediately work for another shipping company" favored independent contractor status).  For instance, Schrufer sold his distribution rights in July 2017 to another IO and negotiated the details of the transaction himself.  UF ¶¶ 3, 148.  Alternatively, Plaintiffs could simply choose to persist in their relationship with BFBD, as Schrufer did for years and as Franze has done.  UF ¶¶ 4, 151.  *See Saleem*, 854 F.3d at 141 (finding plaintiffs' choice "to persist in" their affiliation with defendant to be indicative of contractor status).  And in contrast to an employment relationship, BFBD could not terminate Plaintiffs' contracts (like an at-will employee) except under the limited circumstances in the Agreements.  UF ¶¶ 144-46.

In sum, while the duration of Plaintiffs' relationship with Defendants did not have a fixed term, Plaintiffs controlled it.  *See Saleem*, 854 F.3d at 147 (affirming summary judgment finding of independent-contractor status and underscoring that whatever "the permanence or duration of Plaintiffs' affiliation with Defendants . . . both its length and the regularity of work was entirely of Plaintiffs' choosing").  This factor thus favors contractor status as well.

> **e.      Whether Or Not Plaintiffs' Work Is Integral To Defendants' Businesses, That Plaintiffs' Work Could Be Performed By Others Favors Independent Contractor Status.**

Courts considering whether work is "an integral part of the [alleged] employer's business" find contractor status where, as here, the plaintiff's work is interchangeable with the work of others or could be performed by others.  *Velu*, 666 F. Supp. 2d at 307.  In *Velu*, the court concluded that a delivery driver was a contractor—*despite* the fact that his "work [was] an integral part of Defendant's business model"—because his work was "interchangeable with the work of other drivers; when he refuses work, other drivers fill in."  *Id.*  In *Sellers*, the court reached the same conclusion favoring contractor status but with inverse reasoning:  the plaintiff's work was *not* integral to the defendant's business *because* it "was interchangeable with the work of others" and he was "not hire[d] for unique purposes."  2014 WL 104682, at *8.

There is no dispute that at least BFBD, engaged in contracting with and selling products to IOs, did not sell or deliver to retail customers like Plaintiffs' businesses.  But as to either Defendant, whether or not the Court determines Plaintiffs' work to be integral to their business, there is no genuine dispute that Plaintiffs' work was interchangeable with the work of others.  Indeed, Plaintiffs could and did hire others to work for them, either generally (for two years for Schrufer) or to cover for them on vacation or for other reasons.  UF ¶¶ 61-71.  This factor favors the conclusion that Plaintiffs were contractors as a matter of law.  Even if the Court disagrees, however, the Second Circuit has made clear that not all factors must favor contractor status in order to support that status as a matter of law.  *See supra* at 4.

> **f.      Additional Undisputed Facts Favor Plaintiffs' Status As Independent Contractors.**

The five factors usually considered under the economic realities test are not exclusive, and courts can evaluate the totality of the circumstances with additional factors.  *Velu*, 666 F.

Supp. 2d at 306.  *Arena*, 3 F. Supp. 3d at 9 ("The Second Circuit has applied slightly different factors in different types of cases.").  At least two other factors warrant consideration here.

First, the parties' beliefs about the nature of the relationship are persuasive.  *Saleem*, 854 F.3d at 141.  The *Saleem* court found persuasive that "Plaintiffs' agreements . . . designated them as independent contractors, and some Plaintiffs formed corporations to operate their franchises." *Id.*  Here, Plaintiffs' Agreements confirm the parties' intent to form an independent contractor relationship that was the "essence" of the Agreements.  UF ¶ 5.  Plaintiffs also represented themselves as self-employed business owners ▮▮▮▮▮ and expressly disclaimed their entitlement to any of the benefits or compensation to which employees were entitled, recognizing that instead they were contractors.  UF ¶¶ 6, 7, 28.

Second, Plaintiffs' freedom to operate or work for other businesses made them "less economically dependent on [their] putative employer," which "relinquish[ed] control" favors contractor status.  *Saleem*, 854 F.3d at 141.  Plaintiffs could use their trucks/equipment to deliver noncompetitive products, or they could operate other businesses or seek any other manner of work.  UF ¶¶ 141, 143.  Indeed, Franze worked in security for several years while operating his distribution business.  UF ¶ 142.  *Saleem* favorably cited opinions on precisely this point.  *See, e.g.*, *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (that "[t]he drivers can work for other courier delivery systems" supported contractor status).

> ### 2.  *Plaintiffs Are Independent Contractors Under The NYLL And Thus All Of Their NYLL Claims Fail.*

As Plaintiffs expressed in their August 16, 2018 letter to this Court, the FLSA and NYLL "entail nearly substantially similar legal analysis in the determination of whether plaintiffs were employees."  This Court has agreed.  *See Sellers*, 2014 WL 104682, at *6 (concluding test is substantially similar under NYLL and FLSA and analyzing both simultaneously).  Thus, if this

Court concludes that Plaintiffs are contractors under the FLSA, it should end its analysis and grant summary judgment on Plaintiffs' NYLL claims as well, including for overtime, deductions, and recordkeeping violations. *See* N.Y. Lab. Law § 195 (creating obligations for employers with respect to *employees*); N.Y. Lab. Law § 193 (same). *See also Deboissiere v. Am. Modification Agency*, No. 09 Civ. 2316, 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010) ("New York's labor laws apply only to employees, not independent contractors.").

Alternatively, analysis under the NYLL considers five factors to decide whether a worker is an employee or independent contractor. *Sellers*, 2014 WL 104682, at *5 (citing *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003)); *Velu*, 666 F. Supp. 2d at 306-07 (granting summary judgment against independent contractors). Factors include whether the worker "(1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog*, 1 N.Y.3d at 198-99 (affirming summary judgment and independent contractor status). Additional factors may be considered, including how the parties characterized their relationship and classification for tax purposes. *See Deboissiere*, 2010 WL 4340642, at *3 (contractor classification for tax purposes may "significantly impede" claimed employee status under the NYLL); *Saleem v. Corp. Transp. Grp., Ltd.*, 52 F. Supp. 3d 526, 540 (S.D.N.Y. 2014), *aff'd*, 854 F.3d 131 (2d Cir. 2017) ("[T]he fact that Plaintiffs sought significant tax benefits associated with their independent contractor status weighs heavily in favor of independent contractor status.").

Again, no factor is dispositive to the NYLL test, which focuses on whether the plaintiff had control and discretion over his work and schedule. *Velu*, 666 F. Supp. 2d at 308. "Minimal or incidental control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional

employment relationship." *Browning*, 885 F. Supp. 2d at 598; *Vega*, 78 N.Y.S.3d at 812

(incidental control over the results without control over the means employed to achieve the

results does not evidence an employer-employee relationship).

*a.* ***Plaintiffs Controlled The Means To Achieve Their Results.***

As noted, "minimal or incidental control . . . without the [alleged] employer's direct

supervision" does not establish an employment relationship. *Browning*, 885 F. Supp. 2d at 598.

Indeed, that an alleged employer gives "directions with regard to the particular places at which

the stipulated work [is] to be performed," "specifie[s] the destinations to which articles were to

be conveyed by a person…for transportation work," gives "instructions to the person…to deliver

the goods" in particular ways, or "direct[s] the person…to give special attention to one particular

portion of the work ***does not affect the independence of the contract where the [alleged]***

***employer is concerned only with the result.***" *Id.* at 606. *See also Vega*, 78 N.Y.S.3d at 812.

As discussed as to the FLSA, Plaintiffs (not Defendants) controlled their businesses.

Plaintiffs chose whether and which distribution rights to purchase, how much to pay, how to

finance payment, and whether to incorporate. *See supra* at 4-5. They controlled the scope of

their territories and had the freedom to buy and sell pieces of some or all of their rights. *Id.*

They selected their vehicles, equipment, and insurance without Defendants' oversight and paid

for their own expenses, ██████████████. *Id.* at 5-6, 12. Plaintiffs controlled

whether, how much and when they worked. *Id.* at 6-8. Had they not entered into, or revoked,

advertising agreements for compensation, Plaintiffs would have been free to wear whatever

clothing they wanted. *Id.* at 5-6  And Plaintiffs have not adduced any evidence of a "uniform"

rather than merely branded clothing worn for payments. *Id.* at 5-6. *See Browning*, 885 F. Supp.

2d at 607 (holding that even where "Plaintiffs were required to wear uniforms" and "put logos on

their vehicles," such facts "do not weigh against a finding of independent contractor status"

19

under the NYLL).  Plaintiffs controlled their ordering, inventory, and sales methods without

required training or policies directing them how to do so.  *Id.* at 8-11, 13-15.  Plaintiffs set their

schedules and were free to take breaks, days off, or vacations.  *Id.* at 6-8.  Finally, Plaintiffs were

free to seek other work, run other businesses, or deliver other products not competitive with their

contractual obligations.  *Id.* at 17-18.  Plaintiffs controlled their businesses as a matter of law.

> **b.**     ***Plaintiffs Understood They Were Independent Contractors And*** ███████████████████████████████████████████.

Plaintiffs acknowledged themselves as independent contractors both in their Distribution

Agreements ██████████████.  Plaintiffs' intended "independent contractor relationship"

was "the essence" of their Agreements.  UF ¶ 5.  Plaintiffs' ████████████████████████████

█████████████████.  UF ¶¶ 7-9.  Based on these representations, Plaintiffs claimed

████████████████████████████.  UF ¶¶ 8, 9.

Courts have concluded that precisely these facts show that Plaintiffs were contractors.

*See Deboissiere*, 2010 WL 4340642, at *3 (explaining that an independent contractor

classification for income tax purposes may "significantly impede" an individual's "ability to

claim employee status"); *Saleem*, 52 F. Supp. 3d at 540 ("[T] he fact that Plaintiffs classified

themselves as independent contractors on their tax returns and took business deductions certainly

weighs in favor of independent contractor status.").  The same conclusion is warranted here.

> **c.**     ***Plaintiffs Worked At Their Own Convenience Because They***
> ***Could Choose How Much They Worked And Their Schedules.***

Courts analyzing the question of contractor status under the NYLL often consider the

first and fifth factors, whether a worker "worked at his own convenience" and "was on a fixed

schedule," together.  *Velu*, 666 F. Supp. 2d at 308 (analyzing factors together); *Arena*, 3 F. Supp.

3d at 13 (same).  They emphasize the ability of workers to choose how much they work and

whether the alleged employer imposed a set schedule.  This includes whether or not a worker

was "required to arrive or depart at the office at any particular time, take lunch or rest breaks for

prescribed periods, or clock in or out," and whether the worker "took vacation and personal days

at his own convenience." *Sellers*, 2014 WL 104682, at *6 (finding independent contractor

status); *Velu*, 666 F. Supp. 2d at 308 (same). The fact that the "very nature of plaintiff's work"

obliges him "to work on certain days and certain times" does not preclude a finding of contractor

status. *Sellers*, 2014 WL 104682, at *6; *Browning*, 885 F. Supp. 2d at 602 (pick-up and delivery

time requirements did not preclude contractor status when they stemmed "from the nature of the

business" and were "reasonable in the shipping business" and "[t]he fact that an independent

contractor is required to be at a job or at a facility at a certain time does not eliminate his status

as an independent contractor").

In *Velu*, a delivery driver "worked at his own convenience" where the defendant "did not

mandate a fixed schedule" but merely "informed Plaintiff of the clients' requirements," and then

"Plaintiff communicated directly . . . with the clients to determine his schedule." *Velu*, 666 F.

Supp. 2d at 308. Likewise, Plaintiffs (not Defendants) controlled their schedules, decided on

breaks, took time off at their discretion, and selected their delivery routes subject to their

customers' requirements, with whom they communicated directly. *See supra* at 6-11. Plaintiffs

could also work less or not at all by hiring workers, which they did. *See supra* at 6-8; *Browning*,

885 F. Supp. 2d at 601 (concluding that delivery drivers were contractors under the NYLL where

"Plaintiffs could hire their own additional workers to assist with their operations" and "several of

the Plaintiffs did so . . . this freedom allowed them to further work at their own convenience").

As in *Velu*, "[s]o long as [Plaintiffs] kept the clients happy, [they] w[ere] provided with

significant discretion about how to conduct [their] work." 666 F. Supp. 2d at 308. This factor

also favors Plaintiffs' status as independent contractors.

21

### d.     *Plaintiffs Were Free To Engage In Other Work/Businesses.*

The next factor focuses on the ability to have other employment, without regard to whether a worker spent the vast majority of time on services to the alleged employer. *Sellers*, 2014 WL 104682, at \*6-7. "The comparison of the time spent on each [engagement] is legally meaningless," as the "dispositive point is that [the worker] was, indeed, free to engage in other employment." *Id.  See also Velu*, 666 F. Supp. 2d at 308 (that "Plaintiff was free to engage in other employment, but chose not to" favors contractor status under NYLL). *See also Browning*, 885 F. Supp. 2d at 602-03 (that "Plaintiffs could perform work for other companies, even if it was practically difficult to do so" was more important than "the fact that the Plaintiffs did not actually take on additional employment"). Plaintiffs could engage in other work or businesses, with narrow limitations, and Franze did so. *See supra* at 17-18. This factor clearly favors contractor status. *See Sellers*, 2014 WL 104682, at \*6. ("[T]hat plaintiff was 'free to engage in other employment' indicates that his position 'was that of an independent contractor.'").

### e.     *Plaintiffs Did Not Receive Any Employee Benefits.*

Where a worker does not receive employee benefits, this factor favors independent contractor status. *Velu*, 666 F. Supp. 2d at 307-08.   Plaintiffs received no benefits and in fact disclaimed the right to benefits.  UF ¶¶ 28, 29.  This factor supports contractor status as well.

### f.     *Plaintiffs Were Not On Defendants' Payrolls.*

The final factor favors contractor status where defendants "did not withhold payroll or other employment-related taxes or issue W-2 forms to plaintiff." *Sellers*, 2014 WL 104682, at \*8; *Browning*, 885 F. Supp. 2d at 605 (plaintiffs were independent contractors where defendant did not withhold taxes).  Here, Plaintiffs have not asserted that Defendants did so and cannot dispute they never received Form W-2s.  UF ¶ 28, 29.  Also important is that "Plaintiff[s] certified █████████████████████████████████████████████████████████

███████████████████████████████████████████," which favors

contractor status. *Sellers*, 2014 WL 104682, at *8. Plaintiffs did just that. UF ¶¶ 6-9. In sum,

all of these factors demonstrate, as a matter of law, that Plaintiffs were independent contractors.

> **C.      Schrufer's NYLL Claims Fail Because He Released Them.**

Summary judgment on all of Schrufer's claims under the NYLL (Causes of Action Two

through Four) also is warranted because he released those claims. "Agreements that purportedly

release employers from liability for claims arising under the New York Labor Law overtime

requirements are generally valid and enforceable." *Difilippo v. Barclays Capital, Inc.*, 552 F.

Supp. 2d 417, 426-27 (S.D.N.Y. 2008). Schrufer executed a general release of "any claim, cause

of action, right or interest arising out of" his "ownership of certain Distribution Rights previously

purchased" by him. UF ¶¶ 158-59. Schrufer has adduced no evidence that the Release was the

product of fraud, duress, or undue influence, or otherwise invalid. *Difilippo*, 552 F. Supp. 2d at

427. Schrufer's NYLL claims should be dismissed for this additional reason.

> **D.      Plaintiffs' NYLL Deductions Claims Also Fail Because (1) They Were Not Paid Wages, And (2) Adjustments To Revenue Were Not Wage Deductions.**

The Court alternatively should grant summary judgment on Plaintiffs' deductions claims

under the NYLL, regardless of whether Plaintiffs were contractors, for two reasons. First,

Defendants never paid Plaintiffs "wages" within the meaning of the NYLL. Second, even if they

were paid wages, the challenged "deductions" do not violate the NYLL because they were

adjustments to gross revenues, not deductions from earned wages.

> *1.      Plaintiffs Were Not Paid "Wages" Within The Meaning Of The NYLL.*

Section 193 precludes deductions from "the earnings of an employee for labor or services

rendered." Plaintiffs did not receive "wages" because there is no evidence that amounts paid

were attributable to "labor or services" for Defendants.  Plaintiffs specifically disclaimed any right to wages that would be paid to employees.  UF ¶¶ 28, 29.

No record evidence suggests that Plaintiffs were paid for labor or services.  Instead, it is undisputed that Plaintiffs generated revenue by purchasing products at one price from BFBD, acquiring title to them, selling those products at a higher price, and making money on the difference.  UF ¶ 30.  There was no base, no minimum, and no guarantee.  Nothing in the Agreements indicates that Plaintiffs were paid for labor or a service.  For instance, there are no contractual payments for driving, delivering products, merchandising, or any other labor. Indeed, ***it is undisputed that Plaintiffs were not even required to personally operate their businesses.***  UF ¶¶ 61-71.  There is no better evidence that Plaintiffs were not compensated for labor or services.  Because Plaintiffs did not earn "wages," the NYLL deduction claims fail.

### 2. *There Were No Deductions From Earned Wages.*

Even if Plaintiffs were employees paid "wages," which they were not, deductions are only impermissible if they are made from "earned" wages, as determined by the parties' agreement.  *See Pachter*, 10 N.Y.3d at 617-18.  *See also Levy v. Verizon Info. Servs., Inc.*, 498 F. Supp. 2d 586 (E.D.N.Y. 2007) (charges against commissions not unlawful deductions because, by agreement, employees' compensation was not earned until after adjustments to calculate net payment).  If that agreement contemplates adjustments before compensation is earned, they are lawful.  *Pachter*, 10 N.Y.3d at 617.

In *Pachter*, the employer credited the plaintiff with commissions based on sales, but it then debited "charges" for a variety of expenses.  *Id.* at 613 n.1.  The court held that whether the "charges" violated the NYLL depended upon whether compensation was "earned" before the adjustments such that it could be deemed a "wage."  *Id.* at 617.  "[N]either section 193 nor any other provision of article 6 of the Labor Law prevented the parties . . . from structuring the

24

compensation formula so that [the plaintiff's] commission would be deemed earned only after specific deductions were taken from her percentage of gross billings." *Id*.

Here, it is undisputed that Plaintiffs received payments through a settlement process each week. UF ¶¶ 153-57. Plaintiffs agreed to bear all expenses of the business. UF ¶¶ 19, 20, 155-56. Thus, the weekly settlement statements reflected gross sales and then adjusted that amount down to a net payment to account for the cost of the goods they purchased, loan payments, and other expenses. UF ¶¶ 153-56. Obviously Plaintiffs were not entitled to the full amount of their sales without even accounting for the cost of the products, for example. The Distribution Agreements, settlement statements, and well-established course of conduct for years amply show that Plaintiffs were only entitled to net payments after accounting for their expenses. *See Pachter*, 10 N.Y.3d at 618 ("[E]vidence of the parties' extensive course of dealings . . . and the written monthly compensation statements issued by [defendant] and accepted by [plaintiff]— provide ample support for the conclusion that . . . final computation of the commissions earned by [plaintiff] depended on first making adjustments for miscellaneous work-related expenses."). For this additional reason, the NYLL deduction claims fail as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion should be granted and Plaintiffs' Third Amended Complaint should be dismissed, in its entirety, with prejudice.

Dated:  September 5, 2018

Respectfully submitted,
MORGAN, LEWIS & BOCKIUS LLP
By: s/ *Melissa . Rodriguez*
Melissa C. Rodriguez
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6394
Facsimile: (212) 309-6001
melissa.rodriguez@morganlewis.com

Michael J. Puma
1701 Market Street
Philadelphia, PA 19103
Telephone: (215) 963-5305
Facsimile: (215) 963-50001
michael.puma@morganlewis.com

*Attorneys for Defendants*