UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NICHOLAS FRANZE & GEORGE SCHRUFER,
JR. on behalf of themselves and all other employees
similarly situated,

Plaintiffs,

-against-

BIMBO FOODS BAKERIES DISTRIBUTION,
LLC, F/K/A BIMBO FOODS BAKERIES
DISTRIBUTION, INC., F/K/A GEORGE WESTON
BAKERIES DISTRIBUTION, INC., and BIMBO
BAKERIES USA, INC.

Defendants.

No. 17-cv-3556(NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiffs Nicholas Franze ("Franze") and George Schrufer, Jr. ("Schrufer") (together, "Plaintiffs") bring this action against Bimbo Goods Bakeries Distribution, LLC ("BGBD"), formerly Bimbo Foods Bakeries Distribution, Inc., ("BFBD"), formerly George Weston Bakeries Distribution Inc. and Bimbo Bakeries USA, Inc. ("BBUSA"), collectively ("Defendants" or "Bimbo"), alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.*, and New York Labor Law ("NYLL"), 12 NYCRR § 138-2.1., *et seq.* (*See* Plaintiffs' Third Amended Complaint ("TAC"), ECF No. 46.) Presently before the Court is Defendants' Motion for Summary Judgment. (ECF No. 86.) For the following reasons Defendants' motion is GRANTED.

## BACKGROUND

The following facts are derived from the parties' respective Local Rule 56.1 statements, pleadings, and a review of the record.


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7|2|2019

## I. George Schrufer Jr.

In 1996, Schrufer began to work as a delivery driver of baked goods at Bimbo's predecessor, Freihofer Baking Company, Inc. As a delivery driver, he delivered Bimbo's bakery products to various customers. He began his work pursuant to an agreement ("Distribution Agreement"), which designated him an independent contractor. (Declaration of Melissa Rodriguez ("Rodriguez Decl."), Ex. G, ("Schrufer's Distribution Agreement"), ECF No. 92.) Regarding his delivery route, Schrufer purchased distribution rights for $98,034, making a $15,000 down payment and financing the rest of the purchase. (Rodriguez Decl. Ex. F, Schrufer's April 1, 1996 Bill of Sale; Ex. B, Deposition of George Schrufer ("Def. Schrufer Dep.") 55:24-60:10; 65:16-67:18.) After the purchase, Schrufer selected a delivery territory. (Def. Schrufer Dep. 59:11-23.)

From the 1990s through 2017, Schrufer was deemed an "independent operator" ("IO"). (Rodriguez Decl. Ex. O, Declaration of Schrufer ¶ 2.) As an IO, Schrufer bought distribution rights from IOs and sold them to other IOs to expand or change his territory.[1] (Def. Schrufer Dep. 97:1-98:7;147:13-149:14; 148:23-156:17; 152:9-153:18.)

The Distribution Agreement required Schrufer to obtain prior written approval to sell the route. Further, any potential sale was subject to Bimbo's right of first refusal, and Bimbo received a two percent transfer fee from any sale. (Perlmutter Decl. Ex.13 ¶¶ 6.1, 9.1.) The Distribution Agreement also provided that Bimbo could not unreasonably withhold the sale of Schrufer's territory. (Perlmutter Decl. Ex.13 ¶ 6.1.)

---

[1] Schrufer had several transactions including one in 1998, another in 2009, and two in 2015, which included the purchase and sale of his distribution rights. (Def. Schrufer Dep. 147; Ex. BFBD_00012497-499; Def. Schrufer Dep. 148:23-156:17; Def. Schrufer Dep. 152:9-153:18; Def. Schrufer Dep.163:24-164:22; Rodriguez Decl. Ex. S.)

Schrufer never formed a business entity, though his agreement allowed him to do so. (Schrufer Dep.129:18-130; Schrufer's Distribution Agreement §4.3.)[2] Most of Schrufer's sales over the relevant time period were to five customers. (Perlmutter Decl. Ex. 16, George Schrufer's Margin Minders 2011-2017 ("Schrufer's Margins"), at BBUSA_00009-15.) These customers were two Burger Kings, one Shoprite, and two New York state institutions. (*Id.*)[3] For example, the Shoprite sales constituted roughly 30 percent of Schrufer's total sales from 2011-2016. (*Id.*)

From 2011 through 2016, Schrufer filed tax returns and related forms as a self-employed individual, reflecting his status as a "proprietor" of a "distributor bread/cake: business." (Rodriguez Decl., Ex. J, Schrufer's Tax Returns Excerpts; Rodriguez Decl. Ex. L, Excerpts of Plaintiffs claims for expenses and deductions.) Schrufer's tax returns show that he made a net profit annually from 2011-2016. (*Id.*)[4] Schrufer received distribution rights to some products over time, which increased his sales and the value of his distribution rights. (Def. Schrufer Dep. 88:22-89:19; 157:24.) Schrufer claims he lost money on the investment. (Def. Schrufer Dep. 90:2; 156:19-157:5.) However, when Schrufer sold his distribution rights he could have demanded a higher or lower price. (Def. Schrufer Dep. 170:7-172:15.)

## II.    Nicholas Franze

In 2010, Franze entered into a Distribution Agreement with Bimbo that had similar terms to Schrufer's Agreement. (Rodriguez Decl. Ex. I, Franze June 7, 2010 Distribution Agreement

---

[2] That was, provided he complied with Defendants' non-negotiable requirements that he retain at least 51 percent of stock ownership and remain personally liable for all obligations under the Agreement. ( Ex. 13, ¶4.3.)

[3] A further look at the data submitted by Plaintiffs shows that these customers constituted roughly 60 percent of total sales from 2011-2016. (Ex. 16.)

[4] Schrufer's tax return shows, that in 2011 he made $24,799 in net profit out of $253,039 in gross sales; in 2012, $24,162 out of $248,019; in 2013, $26,153 out of $244,752; in 2014, $24,983 out of $252,833; in 2015, $24,176 out of $278,800; and in 2016, $27,404 out of $286,948. This reflects an annual net profit ranging from approximately 9 to 11 percent. (Rodriguez Decl. Ex. J; Ex. L.)

("Franze's Distribution Agreement")). Franze bought his route from another independent operator, thinking it was a good investment. (Deposition of Nicholas Franze ("Franze Dep.") 59:3-14, 113-10-16.) Franze made a down payment of more than $90,000 and financed the remaining $55,000 of the $148,000 purchase price. (Franz Dep. 118:5-119:6; Rodriguez Decl. Ex. M, Schrufer's Financing Worksheet and Terms/Conditions of Transfer.) From 2011 to 2016, Franze filed tax returns and related forms as the Shareholder of his business entity ZAF Distributors, Inc. (Rodriguez Decl, Ex. K, Franze Tax Returns.) The Distribution Agreement did not require him to be incorporated, but he formed a corporation. (Franze Dep. 179:13-23; 223:2-13.) From 2011 to 2016, Franze's income varied.[5] (Rodriguez Decl. Ex. P, Business Tax Return Excerpts.) At one point, Franze looked into buying a route to sell the Pepperidge Farm brand. (Franze Dep. 29:17-22.) He ultimately did not pursue the purchase because he thought the non-compete clause in his Distribution Agreement prohibited such a sale. (*Id*.) At one point, he considered adding other routes but decided it was not worth it. (Def. Franze Dep. 30:7-8.) Franze also had a job working in security, for which he did not need Bimbo's approval. (*Id*. 63:8-10.)

### III. Facts Common to Both Plaintiffs

Plaintiffs generated revenue based on the sales of products they purchased from Bimbo at wholesale prices, which they sold to customers. (Franze Dep 25:7-23; 117:16-118:4; Franze's Distribution Agreement §§ 1.4; 3.1-3.5; 4.1; Schrufer Dep. 95:23-96:13; 100:6-101:6; 109:2-11; Schrufer's Distribution Agreement §§ 1.3, 3.1-3.5.,4.1.) Plaintiffs decided which vehicles to use, whether to buy or lease them, and the clothes they wore to do business. (Franze Decl. ¶ 4; Schrufer

---

[5] In 2011, Franze reported $14,092 income on $208,053 in gross income; 2012, $30,976 on $425,310 in net receipts; 2013, $34, 599 on $429,200 net receipts; 2014, $25,086 on 415,040 in net receipts; in 2015, $6,780 on $398,984 in net receipts and 2016, $4,070 income on $384,336 in gross income. (*Id*.) In 2011 and 2016, the tax returns report income on gross receipts, not net receipts, compared to the other years. Franze's net sales were $327,701 in 2011; $391,341, in 2012; $385,768 in 2013; $365, 492 in 2014; $348,189 in 2015; in 2016, $335,467 and in 2017 $327,411. (Perlmutter Decl. Ex. 15. BBUSA_000001-8.)

Decl. ¶ 4; Def. Franze Dep. 216:20-218:14; 219:19-220:18; 225:4-226:23; Schrufer Dep. 85:5-19; 93:15-23; 147:10-12.) Plaintiffs signed advertising agreements, whereby they were paid an additional $2,640 per a year or $70 per week for wearing brand logos on their clothing and placing branding on trucks. (Rodriguez Decl. Ex. Z, Advertising Agreement; Franze Dep. 23:15-25; 78:13-25; Schrufer Dep. 143:15-145:6.) Plaintiffs could terminate such agreements with 30 days' notice.

Plaintiffs paid for various items and expenses associated with their distributorship, including the cost of their delivery vehicles, handheld computers, gas, maintenance, and repairs. (*Id.*) Plaintiffs selected their own insurance, albeit pursuant to Defendants' coverage requirements. (Perlmutter Ex. 12, NFO11, Ex. 13, Security Agreement, ¶ 3, Ex. 35.) Defendants were named on Plaintiff's insurance as an additional insurer; and Plaintiffs were required, as part of a security agreement with Defendants, to notify Defendants of any material changes to their policy. *(Id.)* Plaintiffs hired workers to assist them in meeting their contractual obligations. (Franz Dep. 133:18-134:7, 144:5-13; 146:22-147:2; 154:12-17; Schrufer Dep. 78:20, 202:14-22; 204:17-205:5.)

Plaintiffs received no fringe benefits from Defendants. (Franze Decl. ¶¶ 11, 13; Schrufer Decl. ¶¶.) Plaintiffs did not receive W-2s nor did they receive Form 1099s. Plaintiffs also claimed expenses and took deductions from their taxes for tens of thousands of dollars in business expenses for their distributorships. (Def. Franze Dep. 216:20-218:14, 219:19-220:18, 223:24-226:23, 228:10-230:8, Def. Schrufer Dep. 32:13-24, 273:6-291:4; Rodriguez Decl. Ex. L, Excerpts of Plaintiffs' expenses and deductions from tax filings.)

Plaintiffs had no fixed hours, except for when they could access Defendants' depot to purchase and pick up products. (Def. Schrufer Dep. 243:3-19, Ex. 21.) Plaintiffs' customers, however, imposed requirements, such as the days and times they could sell/deliver products or perform merchandising. (Schrufer Dep. 241:18-242:23; ECF No. 92, Deposition of William

Sullivan ("Sullivan Dep.") Sullivan Dep. 79:10-80:9; 81:9-14; Croce Dep. 51:14-17; 110: 11-16.) Plaintiffs could terminate their agreement at any time subject to a few provisions on the sale of their rights. Bimbo could not terminate Plaintiffs' contract except under certain circumstances. (Franze's Distribution Agreement §§ 2, 8; Schrufer's Distribution Agreement §§ 2, 8.)

The non-compete clause in Plaintiffs' Distribution Agreements allowed Plaintiffs to deliver non-competitive products and operate other businesses. (Franze's Distribution Agreement §4.1.; Def. Schrufer Dep. 126:12-21-127:6-17.) Nothing in either Plaintiff's agreement articulated "performance standards" or allowed Defendants to supervise or monitor Plaintiffs.

Under the terms of both Plaintiffs' Distribution Agreements, Defendants acted as Plaintiffs' "agent." (Perlmutter Decl. Ex. 12, Schrufer's Distribution Agreement, Ex. 13, Franze's Distribution Agreement, ¶1.5.) But the Distribution Agreements allow Plaintiffs to revoke Defendants' role as agent. (*Id*.) A Bimbo area manager testified that IOs designate Defendants as agents to help the IOs grow their sales by negotiating with larger facilities that IOs might not otherwise pursue. (Perlmutter Decl. Ex. 7, Deposition of Edward Pinkerton ("Pinkerton Dep.") 25:15-25.) Chain stores and institutions make up a significant portion of Plaintiffs' businesses. (Schrufer's Margins, at BBUSA_00009-15; Ex. 15, Nicholas Franze's Margin Minders 2011-2017 ("Franze's Margins"), at BBUSA_00001-8.)

As Plaintiffs' agents, Defendants would occasionally communicate with customers about an IO's failure to meet contractual obligations and send letters notifying IOs about customers' concerns. (*Id*.) Sometimes, Bimbo would send breach letters asking distributors to cure a default of their contractual obligations pursuant to the Distribution Agreement. (*Id*.) Anthony Paris ("Paris"), another IO, testified that individual chain stores did not deal with individual IOs regarding product issues. (Perlmutter Decl. Deposition of Anthony Paris (Paris Dep.") Dep. 64:3-

65:9.) With institutional customers, IOs were not eligible to bid on contracts or be a contractor. (Perlmutter Decl. Ex. 30(a), Contract Between The New York State Office Of General Services and Orograin Bakeries Sales, Inc. on Behalf of Bimbo Foods, Inc., at BBUSA 40, 67, 172; Ex. 30(b), First Amendment to Award Contract 22407; Ex. 30(c) Invitation to Bid on Board of Education Newburgh Enlarged City School District; Ex. 7, Deposition of Edward Pinkerton ("Pinkerton Dep") 15-18; 31:12-32:11; 50:5-12.) Plaintiffs had no control over product quantities or prices with institutional customers. (*Id.*) (Pinkerton Dep. 64:18-65:6; 68:10-69:5.)

Institutional customers communicated with Defendants regarding service issues. (Emails from Institutional Customers to Bimbo Employees Re: Deliveries, ECF No. 89.) These institutional clients were akin to chain stores under the Distribution Agreement (Pinkerton Dep. 26:16:2; Sullivan Dep. Tr. 28:17-29:16.) With these customers, Defendants set the prices and then supplied Chain stores with quarterly schedules that listed products they supplied at a promotional rate. (Franze Def. Dep. 117:16-25-118:1-4.) The Defendants would post the schedules in their warehouses so that the IOs would receive notice. (Perlmutter Decl. Ex. 5, Deposition of Charles Livermore ("Livermore Dep.") 63:11-65:11; 84:8-23; 95:3-22).

Schrufer testified that he dealt directly with owners of smaller stores with respect to displays, shelf space, and times of service. (Schrufer Dep. 114:10-19; 114:24-115:3.) Plaintiffs represented that they routinely placed orders through a computer system known as "PROMPT" which Defendants' would adjust without their input. (Franze Dep. 35:10; Perlmutter Decl., Paris Decl. Ex. 2 ¶ 6.) However, Franze testified that he could also go into the PROMPT system and cut an order. (Def. Franze Dep. 147:21-148:3.) And if he did not do so in time, he would be stuck with extra product. (Def. Franze Dep. 148:1-3.) If he could not sell the extra product, he could bring it back and exchange it for a return credit subject to Bimbo's policy. (Franze Dep. 148:20-149:4.)

Plaintiffs received no mandatory training or policies on how to meet their contractual obligations. (Schrufer Dep. 80:15-24.) Schrufer was "not aware of" any required training or ride-alongs. (Schrufer Dep. 82:11-14.) Schrufer was not required to attend meetings. (Def. Schrufer Dep. 252:23-253:15.) Rather, Schrufer drew on his experience in the grocery industry to promote his success as an IO. (Schrufer Dep. 53:17-54:8; 53:17-54:8.) This included learning how to increase sales and build relationships with stores and their employees and effective ordering. (*Id.*) Both Plaintiffs testified about the strategies they employed in an effort to maximize sales volume and profits for the business. (Def. Franze Dep. 203:24-204:3; Def. Schrufer Dep 291: 5-14.)

Plaintiffs' ability to communicate with stores regarding promotions and displays, manage and minimize product returns, rotate and maintain fresh products, and manage product ordering and inventory is in dispute, but there is evidence that Plaintiffs, at various times, did these things to maximize profits. (Schrufer Dep 119:2-4; 119:5-120:3; 120:4-11; 120:12-24; 103:22-104:5; Franze Dep. 38:15-22; 204:8-25.) With chain stores and institutional customers, Plaintiffs argue that they were limited in their ability to communicate with stores or to make decisions about product inventory and placements. (Franze Dep. 124:11-22, 186:23-187:10; Schrufer Dep. 102:22-103:13; Lang Dep. 66:17-67:15; Croce Dep. 95:7-15-97:18.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013).

A court should grant summary judgment when a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323 (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). However, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Further, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The Court considers facts that are admissible in evidence. *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir. 1997). A party must support its position by citing to materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations admissions, interrogatory answers, or other materials. FRCP Rule 56 (c)(1). Affidavits may be used to support or oppose summary judgment if the Affidavit is "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Rule 56(c)(4). *See also, DiStiso v. Cook*, 691 F.3d 226, 230 (2d. Cir. 2012).

**DISCUSSION**

Plaintiffs raise a number of claims related to obligations they believe the FLSA and NYLL impose on Defendants by virtue of Defendants being "employers" and Plaintiffs being "employees" under the respective statutes. None of these obligations–related to minimum wage, overtime pay, and recordkeeping–apply to workers who are deemed "independent contractors" as opposed to employees, under the statutes. Therefore, the Court focuses its discussion on the appropriate characterization of Plaintiffs as employees or independent contractors.

## I.  Employees Versus Independent Contractors Under the FLSA

The FLSA imposes federal minimum wage, overtime pay, recordkeeping, and other employment obligations on any entity deemed an "employer." 29 U.S.C. §216 (b).  An "employer" is "define[d] broadly as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.'" 29 U.S.C. §203 (d)(1994). *Herman v. RSR Sec. Services Ltd.,* 172 F.3d 132, 139 (2d. Cir. 1999). Both the Supreme Court and the Second Circuit have emphasized the "expansiveness" of the FLSA's definition of employer. *Id.*

Independent contractors, on the other hand, are non-employee entities who are contracted for limited purposes to perform work or provide services to other entities. Whether workers are employees or independent contractors is legal issue decided by courts. *Saleem v. Corporate Transportation Group*, Ltd., 854 F.3d 131, 148 (2d. Cir. 2017). *See e.g., Browning v. Ceva Freight LLC*, 885 F.Supp. 2d 590, 598 (E.D.N.Y. 2012) (holding that delivery drivers were independent contractors under the FLSA and the NYLL); *Velu v. Velocity Exp., Inc*., 666 F. Supp. 2d 300, 305 (E.D.N.Y. 2009) (same).

Courts in the Second Circuit typically analyze whether a worker is an employee or independent contractor by using factors derived from *United State v. Silk*, 331 U.S. 704, 716-718

(1947). These assists courts in determining the "economic reality" of a work relationship. They include:  (1) the degree of control exercised by the alleged employer over the worker, (2) the worker's opportunity for profit or loss and his or her investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the performance or the duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business. *Brock v. Superior Care, Inc.,* 840 F. 2d 1054, 1058-1059 (2d. Cir. 1988) (citing *Silk's* "economic reality" test).  "The test is based on the 'totality of circumstances' and no one factor is dispositive." *McGuiggan v. CPC Intern*., Inc. 84 F.Supp.2d 470, 479 (S.D.N.Y. 2000) (quoting *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058-59 (2d. Cir. 1988) (citing cases)). With that, the Court begins its analysis.

### (1) Degree of Control Exercised by Bimbo

"The first factor is the nature and degree of the potential employer's control. A business may have control where it, for example, requires a worker to work exclusively for the business; disavow working for or interacting with competitors during the working relationship; work against the interests of a competitor; work inflexible shifts, achieve large quotas, or work long hours, so that it is impracticable to work elsewhere; or otherwise face restrictions on or sanctions for external economic conduct among others." *See* United States Department of Labor Wage and Hour Division Advisory Opinion FLSA2019-6 (April 29, 2019), at 5 ("DOL 2019 Letter") (citing *Saleem*, 854 F.3d at 141-42 (collecting cases finding that a business "relinquishes control" over a worker and thereby makes the worker "less economically dependent" when it allows the worker to "to work for its competitors" or "draw income through work for others"); *Usery v. Pilgrim Equip. Co*., 527 F.2d 1308, 1311 (5th Cir. 1976) (noting control that causes a worker to have "no viable economic status that can be traded to other … companies," such that the worker cannot

operate as "a separate economic entity"); WHD Opinion Letter, 2000 WL 34444342, at *4 (Dec.7, 2000) (finding "significant control" where the workers were "not permitted to work for other businesses while … in the company's service")).

In *Saleem*, the Second Circuit first analyzed control by assessing the level of affiliation the drivers had with their putative employer. The Court noted that the "driver-owners" chose to enter the franchise agreement instead of seeking more conventional employment. *Saleem*, 854 F.3d at 140. Further, each of the plaintiffs' agreements designated them independent contractors. *Id.* Based on the combination of the contract language the Court's assessment of actual and practical control, it found the driver-owners to be independent contractors. *Id.* (explaining that while an employer's "'self-serving label of workers as independent contractors is not controlling,'" it bears on the nature of the relationship).

Here, similar to the situation in *Saleem*, the plain language of Plaintiffs' Distribution Agreements require specific results, but do not provide that Bimbo will control the manner or means for Plaintiffs to accomplish those results. Facially, therefore, the contracts favor independent contractor status. Practically speaking as well, the Court finds that Plaintiffs entered their franchise agreement voluntarily and and controlled the form, size, and scope of their operations, a factor that also favors independent contractor status.

Plaintiffs argue that Schrufer had to enter the agreement or he would have been laid off. (Plaintiff's Memorandum of Law in Opposition to Summary Judgment ("Plf. Mem.) at 4, ECF No. 88.) However, Schrufer had the choice of being laid off with severance or entering into the Distribution Agreement, and he chose the Distribution Agreement. Hence, the Court finds that he entered his contract voluntarily. *See e.g., Saleem*, 854 F.3d at 131 (finding car drivers independent

contractors where they had initial choice of whether to purchase a franchise, either directly from a franchisor defendant or on a secondary market).

The Court also finds that Plaintiffs controlled the size and scope of their territories, and they could buy and sell portions of distribution rights to and from other IOs. Indeed, Schrufer did so multiple times, negotiating deals on his own behalf. Plaintiffs also controlled the instrumentalities of their businesses. They controlled their own vehicles and selected their own insurance, albeit with some help from Defendants. In addition, Plaintiffs hired their own employees to substitute for their work when they needed extra help or went on vacation.

Plaintiffs argue that Defendants controlled Plaintiffs' hours because of requirements for pickup and delivery times. (Pl. Mem. at 4.)  However, Plaintiffs selected their own delivery times and routes, which were only subject to control limits based on their customers' requirements. Plaintiffs had freedom to take breaks and make stops for personal reasons. Similarly, there was no requirement that Plaintiffs work seven days a week. Rather, Plaintiffs could hire others to make deliveries on their behalf.  All these facts reflect Plaintiffs' substantial control.

Plaintiffs argue that Defendants' control is evident from the agency and non-compete provisions in the Distribution Agreements. (Pl. Mem at 8) (citing *Cabrera v Jakabovitz*, 24 F.3d 372, 385 (1994)). Beginning with the agency provision, the Court finds that this contract provision never prevented Plaintiffs from managing their relationships directly with existing customers or from expanding their business with additional, smaller customers. Turning to the non-competition clause, it too was narrow and only prevented Plaintiffs from driving for competing brands. Plaintiffs could drive routes for other products and companies. They also could work other jobs, which Franze did. Though Plaintiffs argue that Franze was prevented from buying competing routes, such as the Pepperidge Farm route, there is no proof in the record that he formally asked

Defendants if he could sell that route or that Defendants rejected any such request. Thus, Plaintiff fails to show that Defendants actually exerted any control over Plaintiffs vis-à-vis the non-compete clause. *Saleem*, 52 F.Supp. 3d at 538.

Separate from language in the Distribution Agreements that arguably relegated control to Defendants, the Court finds that Defendants did not practically control substantial elements of Plaintiffs' jobs. For example, Plaintiffs controlled how much they worked, and Defendants did not impose any schedule on them. Plaintiffs were not subject to any mandatory training or to policies governing the means and manner in which they had to carry out their contractual obligations under the Distribution Agreement. While Plaintiffs argue that they had to comply with product ordering and delivery requirements, as in *Saleem* and *Velu*, Bimbo's arms-length negotiations of some terms for some customers was nothing more than "the [m]inimal or incidental control" that is "insufficient to establish a traditional employment relationship." *Browning*, 885 F.Supp.2d at 598.

Similarly, Plaintiffs argued that Defendants exerted control in dealings with customers that comprised virtually all of Plaintiffs' sale and income. (Pl. Mem at 13.) Plaintiffs cited data that chain stores and institutional customers comprised 88% of their net sales and 82% of their revenue. (*Id*. at 5.) They argued that each Plaintiff had only five customers who accounted for the vast majority of sales, and which demonstrated that their growth opportunities were limited. (*Id*.)

The Court finds that Plaintiffs could have grown their sales with smaller customers, but instead chose to use Defendants' relationships with large chain stores. Hence, although Defendants had the bargaining power with larger customers, they did not actually prevent Plaintiffs from operating their businesses as independent contractors. Plaintiffs had the right to sell their distribution rights and to begin to sell products for another competing company. And even the

transfer of rights provisions in the Distribution Agreement did not allow Bimbo to *unreasonably withhold* the right of sale.

Plaintiffs also argue Defendants' communications with chains and government institutions regarding pricing, store displays, and other matters constituted control, rendering Defendants employers. (*Id.* at 13, 15.) The Court rejects this argument and finds it similar to the "Rulebook" argument in *Saleem*. There too, the Court held that manuals containing drivers' standards of conduct did not reflect a high level of control. Hence, while here, Defendants did exercise some control over Plaintiffs' enterprises, and sent them breach letters when Plaintiffs were not in compliance with the terms of the agreement, Plaintiffs, generally had a high degree of control over how to operate their businesses.

The Court finds that the clients exerted the most control over Plaintiffs. For example, clients dictated what time deliveries could be made or what sort of stock needed to be delivered. Defendants were more akin to intermediaries between Plaintiffs and their clients rather than direct managers—much like the defendant-dispatchers in *Saleem*. Again, Plaintiffs used their own equipment, exchanged their work tasks with other drivers, chose how much they wanted to advertise Bimbo on their clothes and vehicles, chose which employees they wanted to hire, and chose what work they wanted to do. They independently maintained good relationships with customers, communicated with them about their displays and promotions, obtained shelf space, rotated products, ensured an adequate supply of products, offered new products, and communicated with consumers.

In sum, the Court finds that Defendants did not control Plaintiffs directly and closely enough to render their relationship an employer-employee relationship. Hence, this factor weighs in Defendants' favor.

**(2) Plaintiffs' Opportunity for Profit and Loss**

This factor assesses the workers' opportunities for profit and loss. Such opportunities typically exist where the worker receives additional compensation based, not on greater efficiency, but on the exercise of initiative, judgment, or foresight; has the flexibility to negotiate compensation throughout the working relationship; or has capital expenditure at risk in the job. *See* DOL 2019 Letter, at 6 (citing *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1315 (11th Cir. 2013) (explaining that workers earning more due to *managerial skills* versus technical proficiency favors independent contractor status); *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001) (explaining that worker *opportunities* for profit and loss, even where workers are not *solely* in control of profit or loss, favors independent contractor status)).

The Court finds that Plaintiffs enjoyed independent opportunities for profit and loss. The substantial investment Plaintiffs made in purchasing the Distribution Agreements, for $98,034 and $148,000 respectively, through down payments and flexible financing arrangements, as well as their purchases of equipment and instrumentalities, demonstrates that they took a substantial risk on their investments.[6] (*See* Wage Hour Division Opinion Letter, 2000 WL 34444342, at *5 (discussing how placing capital expenditure at risk indicates independent contractor status)).

Further, not only did Plaintiffs make substantial initial investments to launch their work and purchase and maintain their own trucks, but Plaintiffs also generated revenue by purchasing products from Bimbo at wholesale prices and selling them at higher prices to their customers. This structure reflects that they had considerable opportunities for profit and loss, despite not having *sole* control over it.

---

[6] Plaintiffs argue that Plaintiffs were not required to invest any capital because Defendants helped arrange for financing and that Schrufer was "given $15,000 when he converted to an IO that he used towards the downpayment of his route." (Plf. Mem. at 15.) This argument is misleading. Schrufer was given $15,000 from his severance and chose to use his severance for the down payment.

For example, Franze testified that the value of his rights had gone down and he had taken a loss on the business to date. The record showed that other IOs enjoyed large gains. Sherry Bryson, for example, ultimately sold her business for $214,000 plus the cost of her hand-held computer, an amount that she testified was significantly more than what she paid for the business. Hence, delivery drivers could produce profits or losses, largely based on their own business judgment and foresight, which suggests that they bore the risks of their decisions. Hence, this factor favors independent contractor status.

**(3) The Degree of Skill and Independent Initiative Required to Perform the Work**

"The third factor assesses the amount of skill, initiative, judgment, and foresight that are required for the worker's services." *See* DOL 2019 Letter, at 6. Exercising a high degree of skill and independent initiative weighs in favor of independent contractor status. *Schwind v. EW & Associates, Inc*. 357 F.Supp.2d 691, 701 (S.D.N.Y. 2005). For example, in *Rutherford*, while the business profited from the alleged independent contractors' work, the business's profits were not because of the workers' "initiative, judgment[,] or foresight," as would be expected from a "typical independent contractor." *Rutherford*, 331 U.S. at 730. Instead the profits resulted from work that simply "more like piecework." *Id*.

Similarly, in *Saleem*, the Second Circuit concluded that drivers, "[b]y toggling back and forth between different car companies and personal clients, and by deciding how best to obtain business from … clients" increased their personal profits "through the[ir] initiative, judgment[,] or foresight," indicating their "considerable independence." 854 F.3d at 143-44 (internal quotation marks omitted).

Hence, the Department of Labor recently explained that this factor may also look to whether the worker has the "skills necessary to locate and manage discrete work projects [that are]

characteristic of independent contractors," as opposed to skills "of the task-specific, specialized kind that form a piece of a larger enterprise." (DOL 2019 Letter, at 6) (quoting *Wilson v. Guardian Angel Nursing, Inc*., 2008 WL 2944661, at \*13 (M.D. Tenn. 2008)).

Here, the Court finds that Plaintiffs independently had professional driving skills and business management skills in order to perform their work for Bimbo. While driving itself is often not considered a "special skill", *see e.g., Alexander v. FedEx Ground Package Sys., Inc*., 765 F.3d 981, 995 (9th Cir. 2014), Schrufer testified that he drew on his personal experience in the delivery industry to promote his success as an IO. Such skills went beyond driving and included: increasing sales, building relationships with stores and employees, and ordering products effectively. Franze, too, acknowledged the importance of his independent skills of developing good relationships with store managers and personnel to grow his business. Hence, Plaintiffs' independent business, judgment, and foresight was the driver of their success.

Plaintiffs also testified about their money-managing skills, which they deemed critical to making profits. They explained that absent sufficient sales and careful management, they could take a loss in any given year. Thus, they were managing their own independent profits and losses. Further, Plaintiffs needed to know how to drive their delivery trucks safely, how to navigate their routes, which routes they could modify, as well as how to take the initiative to sell their products and deliver them efficiently. Plaintiffs also needed to be able to supervise their own employees.

None of these skills were provided by Bimbo, and they imbued the drivers with significant control over their earnings and provided them with the ability to grow their personal customer base. Indeed, Plaintiffs' independent driving, business, and money-management skills significantly increased their entrepreneurial opportunities.

**(4) The Permanence or Duration of the Working Relationship**

The fourth factor that the Court assesses goes to the degree of permanence in the working relationship between the worker and the alleged employer. Generally, independent contractors have variable or impermanent working relationships with the alleged employer because they "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) (internal marks omitted); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) (same).

Here, Plaintiffs' work with Bimbo was similar to the arrangement many businesses have with gig economy drivers (*i.e.* Uber, Lyft etc.). Courts have often found such drivers to have complete flexibility and impermanence. *See e.g., Razak v. Uber Techs., Inc.,* No. CV 16-573, 2018 WL 1744467, at *36 (E.D. Pa. Apr. 11, 2018) ("Plaintiffs sought profits as they saw fit, during hours and on days that they chose with no advance notice as to when, where, or for how long they would work."). In *Razak*, the district court explained that where "drivers can work as little or as much as they want"—what it called the "hallmark of a lack of 'relationship permanence' with an alleged employer—th[e] factor weighs heavily in favor of Plaintiffs' independent contractor status." *Id*. ("UberBLACK drivers have basically complete freedom regarding how long they wish to serve in this capacity and the hours in which they serve. In other words, there is no permanence of the working relationship whatsoever, unless the driver wants it.").

In *Saleem*, too, the Second Circuit described indicia of impermanent work arrangements:

[T]his case resembles those in which we and other Circuits have recognized independent contractor status. In *Kirsch v. Fleet Street*, for example, we upheld a jury finding that the plaintiff was an independent contractor when, *inter alia*, he "was not required to spend time in the company's offices [and] was free to set his

> own schedule and take vacations when he wished." 148 F.3d at 171. Likewise, in
> *Herman v. Express Sixty-Minutes Delivery Service, Inc.*, the Fifth Circuit concluded
> that a courier service "had minimal control over its drivers" such that they were
> independent contractors because, *inter alia*, "[t]he drivers set their own hours and
> days of work." 161 F.3d at 303. Similarly here, Plaintiffs' freedom in choosing
> when, where, and with what regularity to drive CTG clients shows the extent of
> their economic independence—that they operated their "business organization[s]"
> on their own terms, and as they saw fit. *Rutherford*, 331 U.S. at 730, 67 S.Ct. 1473.

*Saleem*, 854 F.3d at 148.

Here, Plaintiffs had the ability to sell their Distribution Agreements at any time, and Defendants could terminate the Distribution Agreements only under limited circumstances. Hence, as with the cases above, Plaintiffs controlled the terms and *permanency* of their relationships.

Further, while there were some limitations on Plaintiffs' ability to drive for competitors, those limitations were narrow and never enforced. Similarly, while Defendants formally retained certain rights over Plaintiffs' transferring their businesses, those rights were not so onerous that they blocked Plaintiffs from selling their business or prevented Plaintiffs from working other jobs. In fact, Schrufer did sell his business, and Franze maintained another job in security. Therefore, Plaintiffs' actual arrangements were neither permanent, nor exclusive. Hence, as a matter of economic reality, this factor supports Defendants.

**(5) The Extent to which the Work Is an Integral Part of the Employer's Business.**

The fifth factor the Court assesses is whether the service rendered is an integral part of the alleged employer's business. *Brock*, 840 F.2d at 1059 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730, 67 S.Ct. 1473, 1476, (1947); *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382–83 (3d Cir.), *cert. denied*, 474 U.S. 919, 106 S.Ct. 246 (1985).

The Court finds that Plaintiffs' delivery services were an essential part of Bimbo's *distribution chain*. But Bimbo's business model, unlike for example Uber's business model, was not contingent on merely delivering baked goods to other retail consumers. Rather, Bimbo's

primary business model was based on bakery product *manufacturing* and sales to end-market consumers.

Thus, Plaintiffs' role in delivering baked goods in the distribution chain to retail consumers was a small, albeit, important, piece of this model, without which Bimbo would still have a viable business. Therefore, the Court finds that this factor weighs in Defendants' favor.

In sum, based on the totality of circumstances, the Court finds that the economic reality of the relationship between Plaintiffs and Bimbo is that Plaintiffs were independent contractors.

**Claims Against BBUSA**

Plaintiffs filed suit against BBUSA and BFBD. Nothing in the record, however, suggests that Plaintiffs had any contractual relationship with BBUSA or that it was a joint employer with BFBD. Therefore, the Court dismisses all claims against BBUSA as a matter of law.

**New York Labor Law**

The NYLL defines an "employee" as "any person employed for hire by an employer in any employment," N.Y. Lab. Law. §190 (2), and an "employer" as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service." *Id*. §190(3).

New York courts use similar factors to assess employee status under the NYLL as federal courts use under the FLSA. The NYLL, however, has a "slightly different emphasis." *Saleem*, 52 F3d at 536. Rather than focus most on the economic reality test, "the critical inquiry" under the NYLL "pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Group, Inc*., 1 N.Y.3d 193, (2003). In *Bynog*, the New York Court of Appeals listed relevant factors as: "whether the worker

(1) worked at his own convenience, (2) was free to engage in other employment (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* at 198.

The Court has already discussed these factors at length, and indeed, other courts in this circuit have analyzed the FLSA and NYLL factors together, *see e.g., Saleem,* 52 F.Supp. 3d at 536 (S.D.N.Y. 2014), *aff'd,* 854 F.3d 131 (2d. Cir. 2017); *Browning,* 885 F.Supp.2d at 599; *Velu,* 666 F.Supp.2d at 306-307; *Sellers,* 2014 WL 104682 at *6; *Hart v. Rick's Cabaret Intern., Inc.*, 967 F.Supp.2d 901, 924 (S.D.N.Y. 2013) ("[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not he NYLL (or vice versa)").

The Court therefore need not conduct a separate analysis under the NYLL. It already found that Plaintiffs controlled their business operations, managed client relationships directly, hired and fired other workers, worked at their own convenience, were free to engage in other employment, did not receive fringe benefits, were not on the employer's payroll, and did not work on a fixed schedule set by the employer. Thus, it concludes that they were not employees under the NYLL.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for summary judgment is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 86, terminate the case, and enter judgment in favor of the Defendants. Defendants' motion for reconsideration is moot, and thus, the Court directs the Clerk of the Court to terminate ECF No. 111.

Dated:   July 1, 2019                      SO ORDERED:
          White Plains, New York

                                           NELSON S. ROMÁN
                                     United States District Judge